### WILSON v. CLANCY.

(Supreme Court, Appellate Division, First Department.   June 5, 1896.)

NEW TRIAL—NEWLY-DISCOVERED EVIDENCE—CONFIDENTIAL COMMUNICATION.
   In an action against the executor of plaintiff's deceased divorced wife, to recover property, on the ground that it had been obtained by her from plaintiff by fraud, plaintiff's testimony having been that all instruments

by which the conveyance was made were obtained of him while he was drunk, a new trial should be granted for newly-discovered evidence consisting of an unserved answer in an action against plaintiff and such wife (which was settled without further steps in the litigation than the service of the complaint), in which answer. sworn to by plaintiff, the validity of the conveyances to the wife was affirmed; such answer, produced by the executor, and not found in the possession of the attorney of plaintiff and wife, not being subject to exclusion as a confidential communication.

Appeal from circuit court, New York county.

Action by Jacob Wilson against John Clancy, executor of Mary A. Clancy, deceased. From a judgment for plaintiff on the verdict, and from an order denying a motion for new trial, and also from order denying new trial on the ground of surprise and newly-discovered evidence, defendant appeals. Order reversed. Appeal from judgment dismissed.

Argued before VAN BRUNT, P. J., and WILLIAMS, PATTERSON, O'BRIEN, and INGRAHAM, JJ.

G. W. Miller, for appellant.
John L. Hill, for respondent.

PATTERSON, J. The motion for a new trial on the ground of newly-discovered evidence should have been granted. The case is pre-eminently one in which, in furtherance of justice, the defendant should be given the fullest opportunity to defend the estate he represents from the claim made against it, thus far successfully, by the plaintiff. All the facts connected with the cause are of an extraordinary nature, and the establishment of the plaintiff's asserted rights depended almost exclusively upon the degree of credibility to be given to what he swore to. According to his own declaration and the repeated statements of his own counsel, he was a drunken and abandoned profligate. He came into court claiming that he was defrauded by his wife and his attorneys and others acting with them; and that, by devices of various kinds, they induced him, while ignorant of their design, to strip himself of his patrimony; and that all of his property, through and by means of the frauds alleged, came into the possession of his wife, who subsequently procured a divorce from him, after having had him kidnaped and shipped to Australia. The story told by the plaintiff is a very strange one, but the jury, after a very fair submission of the case by the learned justice before whom it was tried, adopted all that the plaintiff had sworn to in his marvelous narrative, finding possibly some corroboration in testimony of apparently indifferent witnesses as to statements and declarations made to them by the plaintiff's wife respecting her desire and intention to get rid of the plaintiff, by fair means or foul. The general statement of the case as it appears now before us will show the controlling importance in its proper disposition of the evidence discovered since the trial, and which is made the basis of the motion, the order entered upon which is now under review.

The plaintiff, Jacob Wilson, was married to Many Keane in 1883. He was then, by his own account, a debauched, degraded, and.

worthless reprobate. Mary Keane was induced to marry him, by the importunities of his father, and the temptation of (to her) a large consideration offered in money and property. She was to be given by Wilson, Sr., a farm in New Jersey, to receive $100 a month, and $15,000 in cash. Part of the contract was carried out by the plaintiff's father. The farm was eventually conveyed; the monthly money contribution was made until May, 1885, when the senior Wilson died; but the $15,000 was not paid. Prior to the death of the elder Wilson, it was supposed he was a widower, with no other child than the plaintiff; but, when he died, it was discovered that he left a widow and two children by a second marriage. This widow asserted her rights, by a suit brought for dower, in the estate of which Wilson, Sr., died seised. That action was resisted by the plaintiff and his wife. It was brought about September, 1885; and the alleged acts of the plaintiff's wife and those claimed to be in confederacy with her, and which constitute the series of frauds claimed by the plaintiff to have been perpetrated upon him, had their origin about this time, and in connection with matters associated with the claim arising out of that litigation. A Mr. Oliver, an attorney at law, was first employed by the plaintiff to represent him in the defense of the dower suit. Subsequently, a firm of other lawyers was substituted in Mr. Oliver's place. In the employment of that firm, as managing clerk or assistant, was a Mr. Hudson, who is charged by the plaintiff with having been, if not the originator, at least the principal agent of the plaintiff's wife, in the perpetration of the frauds alleged to have been committed. The first step in those alleged frauds, having for their object the transfer by the plaintiff of all his interest in his father's estate to his wife, is said to have been taken by Hudson shortly after Oliver ceased to be the attorney for the plaintiff. Hudson drew a deed, which it is said he induced the plaintiff to sign, by which the plaintiff transferred all his interest in his father's estate to one Bruce Fenn, an associate clerk of Hudson. Bruce Fenn thereupon immediately executed another conveyance of the same property and interests to the plaintiff's wife, and thus she became nominally the owner of all that interest. The plaintiff claims that this was done while he was drunk. The dower suit came on to be tried, and resulted in a verdict and judgment for the widow. The deeds referred to, conveying the plaintiff's interest, were made in November, 1885. In December, 1887, the plaintiff executed a power of attorney to his wife, he being, according to his own statement, grossly drunk again. These deeds and the power of attorney were not recorded until 1888. Judgment in the dower suit was entered in January, 1888; and, a sale of the real estate having been ordered in that judgment, the plaintiff's wife became the purchaser of it. She had recovered a judgment against the estate of the elder Wilson for the $15,000 promised her on her marriage, and, with interest and charges, the amount due to her from the estate when the dower suit ended was about $20,000. An application was made on her behalf to the court to have the $20,000 credited upon her purchase, and that

was allowed. Then, and not until then, the deeds and power of attorney were recorded. The authority to credit the $20,000 on the bid was given on condition that it should be on the written request of the plaintiff and his wife, and was so expressed in the order of the court. After the deeds and the power of attorney were recorded, which was on April 2d, Hudson made an application to the court setting forth, in substance, that the condition respecting the consent of the plaintiff. to the credit being made was an unnecessary condition, because the plaintiff's wife, under the two deeds referred to, had become the sole owner of her husband's interest in his father's estate; and thereupon the order allowing the credit was modified, so that it might be made by the referee on the written request and consent of the plaintiff's wife alone. The property that came into possession of the wife was of about the value of $34,000. On May 18th a general arrangement of all matters in litigation seems to have been undertaken. The dower claims were settled. The plaintiff ratified the deeds, was to receive a sum of about $2,000 in money, and the plaintiff's wife was to get the balance of $14,000 from the referee, that being the amount of the purchase money paid in over and above the $20,000 credited. A paper was executed by the plaintiff at that time, when, as he swears, he was grossly intoxicated again, having been made so, as he says, by Hudson. The plaintiff's wife received from the referee the $14,000 early in June, 1888, and the general settlement took place on the 22d of June, 1888.

Without going further into the details of the alleged frauds, the foregoing will suffice to show that by July, 1888, Mrs. Wilson had become the owner of the real estate sold in the dower suit, and had received, in addition, the $14,000 from the referee. The plaintiff now claims that every paper he signed during all these years was procured from him while he was intoxicated. It is also claimed that, thus having become denuded of all his property, and having been induced to ratify all his unconscious acts, his wife and Hudson concocted and carried out a scheme to get rid of him altogether, not only for the purpose of preventing his attacking the transactions connected with the transfers of his property to his wife, and his ratifications thereof, but in order that she might also procure a decree of divorce against him. The divorce suit was begun on the 26th of October, 1888, and the summons was served on the plaintiff. He appeared in that action by an attorney, and interposed an answer. The issues were tried before a referee. All this he claims was done while he was drunk again. The scheme to get him out of the way was to ply him with liquor, and, while he was in a drunken, helpless state, put him on shipboard, and send him to the Antipodes. His story is that Hudson was constantly inducing him to drink, and furnished him with small sums of money to buy liquor, until, on the night of December 11, 1888, and while he was entirely unconscious, he was put upon a vessel called the "Creedmore," which sailed early the next morning for Australia, and he only recovered consciousness when the ship was far out at sea.

As this action was framed, and according to the averments of the complaint, the plaintiff sues to recover the value of the share of his father's estate he claims his wife procured by reason of the fraud, or series of frauds, perpetrated upon him in inducing him to divest himself of all his interest in that estate by the deeds and the confirmatory instruments and writings above referred to. All the testimony with reference to the acts of the inculpated persons after the transfers and the confirmatory papers were executed, and after the entry of the decrees and orders in the dower suit, are important as showing a reason and motive for the perpetration of the frauds, and as part of the general scheme to injure and despoil the plaintiff. The one great and determinate question of fact which, upon the whole case, it was for the jury to consider and pass upon, was whether the plaintiff knowingly, intentionally, and advisedly made the deed to Bruce Fenn, and sanctioned or ratified all the other instruments and transactions which vested the title to his interest in his father's estate in his wife. If the affirmative were true, then his assertions as to the conspiracy and scheme to defraud him are baseless. Now, it is made to appear by the papers submitted to the court on this application for a new trial that, since the verdict of the jury and the entry of the judgment in this action, the defendants have discovered a piece of evidence which shows, if it is genuine, and was intentionally made, beyond the possibility of a doubt or refutation, that the whole of the plaintiff's case respecting the fraudulent procurement of the transfers is a mere fabrication, and rests altogether upon his deliberate perjury. It will be remembered that, when the dower suit was brought, Mr. Oliver was employed as an attorney for Jacob Wilson and his wife. After his employment ceased, he sued them, and recovered a judgment for $3,556 against them, for his agreed compensation. Still, subsequently he brought a suit in equity against Jacob Wilson and his wife to have that judgment made a charge upon real estate, being the real estate which had formerly belonged to Jacob Wilson, Sr., and which had become vested in the plaintiff's wife under the referee's deed in the dower suit. In his complaint in the equity suit, Oliver made certain allegations respecting the conveyances of Jacob Wilson to Bruce Fenn, and of Bruce Fenn to Mary A. Wilson, being the same conveyances attacked by Jacob Wilson in this action, and charged that Jacob Wilson had caused the title to be transferred, through Fenn, to his wife, Mary, for the purpose of raising funds to enable him (Jacob Wilson) to defend the dower suit, and for the purpose of paying Jacob Wilson's debts, and that it had been agreed between Jacob Wilson and his wife that, after the termination of the dower suit and the payment of Jacob's debts, she would convey one-half of what remained to her husband.

Mr. Minrath, who had charge of the action for Oliver, states that in that action Wilson appeared by Peter J. Kelly, an attorney, but the action was settled without further steps in the litigation than the service of the complaint. But it is now made to appear that, since the entry of the judgment in this action, there has been found among the papers of Mary A. Wilson an answer sworn to in the Oliver suit by Jacob Wilson, on the 4th day of September, 1888, which

was drawn by Kelly, the attorney for Jacob Wilson and Mary A. Wilson, and which contains a clear, explicit, and unequivocal refutation of all that the plaintiff has sworn to in the present action respecting the nature of the instrument by which he became divested of title in his father's estate in favor of his wife.   In that answer he affirms the validity of such transfer.   He avows distinctly that his wife had paid to him $14,545, a sum which he states to be largely in excess of what was allowed her on the settlement of the action brought by the widow.   He also swears that the real estate became vested in Mary A. Wilson by virtue of the order by which all the controversies and issues which existed by reason of the dower action were finally settled and disposed of.   He denies that he made any agreement with his wife whereby, in consideration of any conveyance or transfer to her, she was to use the property for the purpose of raising funds to be disposed of as Oliver mentioned in his complaint, or that he ever had any agreement with reference to that property with her, and he virtually affirms her ownership as being absolute and beyond attack.   This answer was sworn to on the 4th day of September, 1888.   Its existence was not known to the defendant at the time this action was tried.   The circumstances of its discovery are sworn to, and there does not seem to be any possibility of doubt as to the genuineness of the signature of Jacob Wilson to the verification of the answer, which was drawn by Kelly, the attorney, who it appears is now dead.   Mr. Delevan, the notary public before whom the answer was verified, made a deposition, under compulsion of the court.   He swears that Jacob Wilson signed and swore to the answer before him; that Jacob Wilson initialed the five pages of the paper; and that Jacob Wilson introduced him (Delevan) to Kelly, at whose request the verification was taken.   Every circumstance that would authorize the court to grant a new trial on the ground of newly-discovered evidence was present in this application.   The evidence is not only material, but may be decisive of the case.   It was not accessible to the defendant at the time the case came on for trial, for its existence was not known.   Nor is there anything in the allegations of the complaint which would apprise the defendant of the particular grounds upon which the instruments were to be attacked as fraudulent, unless it may be allegations charging forgery, of which there is not one particle of proof in the case.   Even if that consideration were important, the evidence is not cumulative; for, while it goes to the point of the voluntary and deliberate execution of the papers attacked by the plaintiff, yet it is upon another line of refutation of his claim than that which was pursued by the defendant in making his proofs on the trial, and differs widely from what is contained in the affidavit of Wilson, sworn to July 11, 1888.

The learned judge below, in denying the motion for a new trial, was induced to do so only by the consideration that the answer, not having been served, and never having been used as a pleading, must be regarded as a confidential communication between Jacob Wilson and his attorney, Kelly, and therefore could not be used as evidence against the plaintiff in this action.   But, under the circumstances in

which this paper was found, it cannot be regarded as covered by the rule of privilege. Certainly, Mr. Kelly would not have been allowed to testify concerning it, nor would he have been allowed to produce it; but it comes from the immediate possession of the executor of the will of the grantee named in the deeds attacked. There is no question of privilege arising under such circumstances. It is not demanded from the possession of Kelly, nor is it produced from among Kelly's papers; but it is found in the possession of the representative of the very person who claims protection under that paper. There is no presumption that it came unlawfully into the possession of that person. On the contrary, if any presumption is to arise at all, the fact of its possession implies that it is legitimately there. Kelly was the attorney, not only of Jacob Wilson, the plaintiff, but was also the attorney of his wife. The answer relates specifically to her interests. It was sworn to as an answer in an action in which she was a co-defendant with Jacob Wilson, and its delivery by Kelly to her as a paper connected with the suit in which she was a party is as fair a presumption as that she procured it in any irregular, illegitimate, or improper way. It was her title that was being defended by that very answer, and it is also a fair presumption that Jacob Wilson allowed that paper to be given to her as one assuring her title to the property. There is no doubt about the general question respecting the privilege of communication to an attorney covering even the papers in a case; but we think the learned judge below failed to consider that this paper was out of the possession of the attorney, was in the hands of the party whose title is confirmed by it, and who, therefore, would have the right to make use of it, to repel an assault made upon that very title which receives its confirmation from it. The newly-discovered evidence was all-important, and, as we think, may be decisive of the case upon a new trial, unless the plaintiff is able to convince another jury that it also was procured from him by fraud, or while he was in an irresponsible condition, from intoxication. The order denying the motion for a new trial must be reversed, and a new trial granted, and the judgment set aside, upon payment to the plaintiff of the costs of the former trial; to be taxed.

The appeal from the judgment must be dismissed.

VAN BRUNT, P. J., and O'BRIEN and INGRAHAM, JJ., concur. WILLIAMS, J., concurs in result.

---

### W. T. MERSEREAU CO. v. WASHBURN.

(Supreme Court, Appellate Division, First Department. June 5, 1896.)

STATUTE OF FRAUDS—PROMISE TO PAY DEBT OF ANOTHER.
   Where contractors refused to go on with the work after completing half of it, because the owner had not made the stipulated payments, a parol promise by a mortgagee of the property to pay or see paid the contract price for the last half of the work on its completion is not within the statute of frauds. Ingraham, J., dissenting.